UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
RICKY ZEGELSTEIN et al., :
:
                Plaintiffs, :
:   16-cv-3090 (KBF)
      -v- :
:   <u>OPINION & ORDER</u>
HAROON CHAUDHRY et al., :
:
                Defendants. :
:
------------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

        In April 2016, plaintiff Ricky Zegelstein, M.D., and her two associated professional organizations, Custom Anesthesia Services, P.C. ("CAS"), and Innovative Anesthesia Solutions, P.C. ("IAS") (together, "plaintiffs"), sued numerous individuals and entities for a host of purported claims including, inter alia, accounting, Racketeer Influenced and Corrupt Organizations Act ("RICO"), conversion, negligence, and fraud. (ECF No. 3.) On December 5, 2016, she filed an Amended Verified Complaint ("Am. Compl."), adding numerous additional entities and individuals as defendants, dropping her RICO claim, and adding claims for unjust enrichment, identity theft, breach of contract, breach of the covenant of good faith and fair dealing, and tortious interference with business relations. (ECF No. 105.) This case was transferred to the undersigned on September 11, 2017.

        Plaintiffs' core assertion is that the defendants—who include a diverse group of physicians, the professional practices with which those physicians are associated, a billing company, and numerous insurance companies—engaged in a long-term

and sprawling false billing scheme. In this regard, plaintiffs allege that the defendant physicians and their associated professional entities submitted numerous false claims to the defendant insurance companies for services plaintiffs had already provided; when plaintiffs notified the insurance companies of the falsity of these claims, they were apparently ignored. According to plaintiffs, the scheme was designed to enrich the defendant physicians and their professional entities and to punish plaintiffs for being out-of-network. Plaintiffs further allege that this false billing scheme interfered with patient relationships and deprived plaintiffs of payments to which they were entitled.

Before this Court are a series of motions to dismiss. (ECF Nos. 110, 113, 115, 118, 121, 125, 127, 138.) Every defendant has moved to dismiss every claim. The Court agrees that plaintiffs' claims should be dismissed.

I. ALLEGATIONS IN THE AMENDED COMPLAINT

For purposes of this motion, the Court accepts plaintiffs' allegations as true and construes all reasonable inferences in their favor.[1]

Zegelstein is a New York licensed physician, who has been a board-certified anesthesiologist since 1990. Her business model has been to provide services directly as well as through other physicians she employs ("Services"). While Zegelstein alleges that she billed the insurance companies for both the Services she provided herself and those she employed others to provide, the bulk of her

---

[1] The facts are drawn from plaintiffs' amended complaint. The Court does not include references to every paragraph, as the complaint is drawn a confusing and nonlinear manner.

2

allegations appear to relate to situations in which Zegelstein was hired by another physician or practice to provide Services. Zegelstein was an out-of-network provider.

Among the physicians that plaintiff Zegelstein alleges she employed or worked with were the defendant physicians: Drs. Chaudhry (who owns and operates Xenon Medical, P.C. ("Xenon")), Faust (who owns and operates Corinthian Medical Associates, P.C. "Corinthian")), Kaminetsky (who owns and operates University Urology Associates ("UUA")), Krumholz (who owns and operates Krumholz PC, One Eleven Medical, P.C. ("OEM"), and East Side Gastroenterology, P.C. ("ESG PC"), and Raymond (who owns and operates Alan Raymond, M.D., P.C.) (collectively, the "defendant Physicians"). Plaintiffs allege that the billing company involved in the scheme is simply called "Billing Company." In addition, the defendant insurers include Aetna, Cigna Health and Life Insurance Co. ("Cigna"), Empire HealthChoice HMO, Inc. ("Empire"), Blue Cross Blue Shield Association ("BCBS"), and Oxford, a subsidiary of United Healthcare ("UHCNY") (collectively, the "defendant Insurers").

Plaintiffs allege that in 2001, Zegelstein formed CAS to provide anesthesia services directly from her as well as through other physicians "she would employ." (Am. Compl. ¶ 47.) To do this, she established relationships with third-party physicians. According to plaintiffs, her arrangements with third-party physicians included a provision that allowed Zegelstein to directly bill the patient's healthcare

3

provider. For the most part, Zegelstein was not and did not intend to become an in-network provider.

In sum, the arrangement allowed plaintiffs to provide anesthesia services to the defendant Physicians' patients, and plaintiffs were "the only parties that were legally allowed to bill" the defendant Insurers. (Id. ¶ 51.)

According to plaintiffs, each defendant Insurer had access to plaintiffs' billing and healthcare records, through profiles the Insurers maintained as to the plaintiffs. Thus, while plaintiffs might have been unable to determine whether a payment had been made or how much the payment was for, one of the in-network defendant Physicians "linked to one of Plaintiffs' profiles would." (Id. ¶ 53.) While it is unclear what plaintiffs are referring to here, they do reference profiles associated with "Council for Quality Healthcare" ("CAQH").[2]

In addition, at some unknown time, plaintiffs allege that defendant Physicians submitted false claims for services which plaintiffs had already provided and billed. (Id. ¶ 55.) Plaintiffs also allege that at some point they notified the defendant Insurers of this alleged fraudulent billing. They add that the Insurers were not only not interested in pursuing the matter, but in fact blocked plaintiffs from "discovering the facts about the scheme." (Id. ¶ 57.)

Plaintiffs allege that access to plaintiffs' profile allowed the defendant Physicians, Billing Company, and various Doe defendants to (1) interfere with

---

[2] Plaintiffs include a series of allegations about CAQH's practices somehow enabling "imposters and fraudsters to hijack the accounts of physicians as in the case at hand." (Am. Compl. ¶ 63.)

patient relationships, by making payments to the defendant Physicians; (2) bill for anesthesia services performed by plaintiffs and for which payment belonged to plaintiffs, and bill for services under Plaintiffs' Employee Identification Numbers ("EIN") and/or National Provider Identifiers ("NPI"), resulting in plaintiffs having unintended tax consequences; and (3) wrongfully retain insurance proceeds belonging to plaintiffs.

    A.  <u>The Defendant Physicians</u>

With regard to defendant Physicians, plaintiffs allege as follows: plaintiffs provided services <u>to</u> Krumholz's patients under a contractual arrangement for an eight month period in 2002. (<u>See, e.g.</u>, <u>Id.</u> ¶¶ 66, 71.) Plaintiffs assert that starting in 2012, they began to receive correspondence from UHCNY and Aetna indicating that "Krumholz was attached to [their] NPI and/or [EIN]." (<u>Id.</u> ¶¶ 72, 81.) They received documents indicating that this continued to be the case in 2013 and 2014. After receiving documents from UHCNY appearing to indicate the usage of their NPI and EIN, plaintiffs sought any amounts Krumholz had received that had been diverted to him. Plaintiffs allege that in 2012 and 2013, they learned that Krumholz had billed for procedures that plaintiffs had performed in 2004 and 2005. (<u>Id.</u> ¶¶ 95, 96.) They further allege that via a telephone call with UHCNY, they discovered that Krumholz had contracted with UHCNY to "be part of Plaintiffs' groups." (<u>Id.</u> ¶ 92.)

As to defendant Faust, plaintiffs allege that Zegelstein began working <u>for</u> him in 2002. They further allege that the terms of their arrangement were largely the

same as those with Krumholz. Pursuant to that arrangement, plaintiffs provided services to a patient in 2005; in 2006 CAS had still not received payment. In correspondence between plaintiffs and the patient, the patient indicated that he had provided any monies owed to Faust, and that Faust had advised the patient that he would make arrangements to pay plaintiffs. Plaintiffs further assert that they were in fact then provided payment by Faust. A similar situation occurred on one other occasion in 2010. Plaintiffs also assert that in 2012 mail began to arrive at Zegelstein's office addressed to Faust. (Id. ¶ 112.) In 2012, plaintiffs received three checks made payable to Faust. Zegelstein investigated and was told that UHNCY had received claims that indicated that Faust was the anesthesiologist. Plaintiffs do not allege that they in fact provided the services and that Faust had not—the connection with plaintiffs appears to have been through the plaintiffs' EIN and/or NPI, which were referenced in the UHCNY Explanation of Benefits ("EOB") associated with the claims. Plaintiff complained to UHCNY about this use of her EIN and NPI, but UHNCY informed plaintiff that Faust was not associated with her EIN or NPI, or at least had not been after December 2012.

According to plaintiffs, "Faust's scheme to defraud Plaintiffs also included the diversion of payments meant for Plaintiffs." (Id. ¶ 133.) In this regard, they cite an instance in February 2013 in which plaintiffs learned that "Patient FW" had received a check from his/her insurance provider for services provided by plaintiffs; handwriting on the check indicated that the check had been forwarded to Faust's office.

6

As to defendant Kaminetsky, plaintiffs allege that plaintiffs started working for him in 2001. The relationship mirrored that with Krumholz. Their professional relationship ended in 2008. Plaintiffs remaining allegations as to Kaminetsky are similar to those referred to above with Faust and Krumholz. In sum, in 2012, plaintiffs learned that there was some connection in the UHCNY database between Kaminetsky and plaintiffs' EIN/NPI, and plaintiffs complained to the insurer. In February 2013, plaintiffs sent Kaminetsky a letter informing him that plaintiffs' patients "may have" mistakenly forwarded insurance reimbursements to his office. (Id. ¶ 148.) Plaintiffs do not allege that a single reimbursement was in fact misdirected.

As to Chaudhry, plaintiffs allege that he entered an employment agreement with CAS (one of Zegelstein's companies) in 2002, and that pursuant to the terms of that agreement, Chaudhry was to receive a lump sum compensation amount of $145,000. CAS was to conduct all billing and collect all payments for services that Chaudhry performed pursuant to that agreement. Plaintiffs allege that "[a]t some point the Employment Agreement ended," and Chaudhry provided services to CAS thereafter as an independent contractor. (Id. ¶ 154.) In 2004, CAS began making payments to Chaudhry's Company "Advanced Anesthesia, P.C." In November 2012, plaintiffs learned that somehow UHCNY had a "Provider Demographic Form" that listed Chaudhry as located at "Zegelstein's address." (Id. ¶ 157.) Plaintiffs again allege that in connection with that form, Chaudhry had to use plaintiffs' EIN.

7

As to Raymond and SMG PC, plaintiffs allege a professional relationship that started in 2004 and ended in 2008. The terms of that relationship were, again, similar to that she had with Krumholz. Plaintiffs allege that on or about January 6, 2011, after several years of no contact with Raymond or SMG PC, Zegelstein received a letter stating that she should cease communicating with the patients of the firm regarding billing. Zegelstein replied, asserting a right to contact the patients for amounts due and owing. Plaintiffs assert that thereafter, plaintiffs learned that payments they should have received had instead been sent to SMG PC. Plaintiffs next assert that defendant Raymond and his wife had been instructing patients to direct payments received from the defendant Insurers to them, instead of to plaintiffs. According to plaintiffs, in June 2012, defendant Raymond conceded that checks meant for plaintiffs may have been sent to SMG PC and inadvertently cashed. (Id. ¶ 179.) Plaintiffs commenced a civil action in state court regarding this billing issue. In 2013, plaintiffs learned that a database used by insurance companies called "Navinet" listed Zegelstein's billing address as Raymond's office address, and it also listed her EIN. Plaintiffs assert that it was at this time that Zegelstein put all of the above pieces together and "began to realize that Defendants were in an organized scheme to steal from her." (Id. ¶ 189.)

B. The Billing Company

With respect to the defendant Billing Company, plaintiffs allege that in 2003, Zegelstein hired MDM, a predecessor company to Vcarve, to provide bill processing and collection services. Zegelstein terminated that relationship in 2004. However,

8

in 2013, plaintiffs received a letter from UHNCY indicating that MDM was still listed as an address for mail delivery. In May 2013, Zegelstein notified the defendant Insurers of this. In 2014, plaintiffs notified an individual who Zegelstein knew to be the spouse of the original owner of the defendant Billing Company, that MDM was still being listed as a "pay to address" with several insurance companies. Plaintiffs were subsequently informed that as of 2005, Vcarve had acquired the business of MDM. Plaintiffs do not allege that any payments were sent to MDM or Vcarve that should have been directed to plaintiffs.

    C. <u>The Defendant Insurers</u>

With regard to the defendant Insurers, plaintiffs allege that, with limited exceptions, plaintiffs never authorized any other party to bill or collect for Services provided to patients. They further allege that while they performed Services through the defendant Physicians' practices, which had contracts with the defendant Insurers, plaintiffs did not have their own contracts. (<u>Id.</u> ¶¶ 216-17.) Thus, plaintiffs allege that at all relevant times they were considered "out-of-network." (<u>Id.</u> ¶ 218.) Plaintiffs allege that out-of-network status meant that the defendant Insurers would from time to time incorrectly claim that a patient was not covered at the time of service, and that the defendant Insurers were able to bill and collect for plaintiffs' Services at a "non-contracted" rate. (<u>Id.</u> ¶ 224.) Thus, according to plaintiffs, the defendant Insurers would pay higher fees to plaintiffs than to in-network providers. According to plaintiffs, this led the defendant Insurers to seek out an in-network provider where possible.

In addition, plaintiffs allege that at some point they learned that someone that had attached himself to plaintiffs' group at UHCNY and BCBS had switched plaintiffs' payment directive: instead of directing that payments be "pay to group", they were directed to "pay to individual provider." (Id. ¶ 229.) According to plaintiffs, this "may" have led to misdirected payments or false claims.

With regard to the individual defendant Insurers, plaintiffs allege a billing dispute with Aetna dating back to 2014, along with the association of plaintiffs' EIN/NPI with defendant Krumholz. As to Cigna, plaintiffs allege that it made payments to third parties, including but not limited to the defendant Physicians, when it should have paid plaintiffs. Cigna provided plaintiffs with a list of payments, some of which dated back to 2002. Plaintiffs do not allege that everything on the spreadsheet relates to payments they should have but never received—and indeed their allegations suggest they had received certain of the payments. The only payment which plaintiffs explicitly state should have been received but was not relates to services performed in 2002. (Id. ¶ 268.)

With regard to BCBS and UHCNY, the allegations follow a similar pattern. In 2011, plaintiffs received information that BCBS had an erroneous mailing address for plaintiffs. They allege that payments for Services that plaintiffs may have provided may have been misdirected, but there are no specific allegations as to what payments those may have been, and when the services were provided. As to UHCNY, plaintiffs allege that again, they received a communication indicating confusion as to the affiliation of one of the defendant Physicians.

10

## II. MOTION TO DISMISS STANDARD

On a motion to dismiss, this Court accepts as true all well-pleaded factual allegations. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). This means that the Court must accept plaintiff's factual allegations in its complaint as true and draw all reasonable inferences in plaintiff's favor. See Famous Horse Inc. v. 5th Ave. Photo Inc., 624 F.3d 106, 108 (2d Cir. 2010). To withstand dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. In applying this standard, the Court accepts as true all well-pled factual allegations, but does not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." Id. The Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). If the Court can infer no more than the mere possibility of misconduct from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate. Twombly, 550 U.S. at 570.

III. DISCUSSION

It is plain from the above recitation of facts that all claims must be dismissed and this action terminated. While this Court understands that clients sometimes view issues that have arisen over the course of their lives as supporting a legal claim, it is up to counsel to review the facts. Sometimes—and as is certainly the case here—lawyers must give their clients the disappointing news that despite their views, no claim lies.

This Court is troubled that plaintiffs' counsel filed this case in the first instance.[3] While this Court could write many pages on how the allegations fall short of each of the asserted claims as to each defendant, it need not spend the judicial resources to do so. It is more than passing obvious that the allegations fail to meet the basic pleading requirements of Rule 8 of the Federal Rules of Civil Procedure and the principles set forth in Twombly. These principles—on their own and without more—require dismissal of all claims. From what the Court can glean from the allegations, plaintiffs are convinced that there is a sprawling agreement between and among the defendants, to defraud them of monies owed. The allegations in the complaint do not plausibly support any claim—and certainly no claim that is timely.

Instead, the allegations fail to tell a coherent story. Rather, they appear to suggest a level of paranoia about defendants' actions that is concerning for a

---

[3] The Court notes that a nearly identical action was brought and dismissed in state court, on procedural grounds. Zegelstein v. Faust, 2015 WL 1941363 (N.Y. Sup. Ct. 2015). The Court does not here address, and the parties have not briefed, the issue of collateral estoppel.

number of reasons. The complaint is long and tortured—stringing together unrelated Physicians and unrelated Insurers; the only common factor is plaintiffs' view of a connection between them. There is no allegation suggesting one exists. Thus, based upon the group pleading alone, and the joinder of all parties into a single action alone, this case would and must be dismissed. But there are additional reasons.

As pertinent here, it is clear that the allegations are not supportive of a live claim under any of the legal theories asserted. At best, they amount to no more than old billing issues plaintiffs have had with different Physicians and their practices. In this regard, the Insurers are bystanders who plaintiffs allege failed to take serious a fraud against them that plaintiffs brought to their attention. This, of course, is defendant Insurers' right. The allegations regarding more recent claims—that the databases of the defendant Insurers have not adequately tracked changes in address or associated EIN and NIPs—do not add up to anything at all. There is no plausible allegation that the reference to plaintiffs' EIN/NIP means that there is fraud or other nefarious actions in play. There is no clear allegation of a known misdirected payment.

In sum, all claims fail. All motions to dismiss are GRANTED and this action is dismissed. Plaintiffs are warned that they must carefully evaluate any further actions on this case. If frivolous filings are made they shall be dealt with seriously and immediately.

IV.   CONCLUSION

For the reasons discussed above, the motions to dismiss are GRANTED.  The Clerk of Court is directed to close the motions at ECF Nos. 110, 113, 115, 118, 121, 125, 127, and 128 and to terminate the case.

SO ORDERED.

Dated:    New York, New York
          October 18, 2017

_____
KATHERINE B. FORREST
United States District Judge